# Illinois Official Reports

## Appellate Court

<br>

*In re M.A.*, 2014 IL App (1st) 132540

<br>

| | |
|---|---|
| Appellate Court Caption | *In re* M.A., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. M.A., a Minor, Respondent-Appellant). |
| District No. | First District, Third Division <br> Docket No. 1-13-2540 |
| Filed <br> Rehearing denied | May 28, 2014 <br> June 23, 2014 |
| Held <br> (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The automatic requirements of the Illinois Murderer and Violent Offender Against Youth Registration Act that juveniles adjudicated delinquent for certain offenses register as violent offenders against youth for a minimum of 10 years following the adjudication is unconstitutional, since the Act violates procedural due process by failing to allow a juvenile offender an opportunity to petition to be taken off the registry and it violates equal protection to the extent that juveniles required to register as sex offenders are treated more leniently than juveniles required to register as violent offenders against youth, especially when the sex offenders are not required to register as adults upon turning 17 and they have an opportunity to demonstrate that their obligation to register should be terminated after 5 years. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-JD-4659; the Hon. Stuart P. Katz, Judge, presiding. |
| Judgment | Reversed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D, Goldberg, and Rachel Moran, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Veronica Calderon Malavia, and Annette Collins, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE MASON delivered the judgment of the court, with opinion.
Presiding Justice Hyman concurred in the judgment and opinion.
Justice Pucinski concurred in part and dissented in part, with opinion.

## OPINION

¶ 1    In her first referral to juvenile court, 13-year-old respondent-appellant, M.A., was adjudicated delinquent of certain charges arising out of an altercation with her older brother. As a result of this adjudication, M.A. was ordered to register for a minimum of 10 years under the Illinois Murderer and Violent Offender Against Youth Registration Act (Act) (730 ILCS 154/1 *et seq.* (West 2012)). The Act automatically requires juveniles adjudicated delinquent for certain offenses to register as violent offenders against youth for a minimum of 10 years following adjudication. There are no exceptions to the registration requirement and juveniles are automatically required to register as adults when they turn 17. M.A. challenges the Act's application on a number of grounds, including substantive and procedural due process and equal protection. We determine that the Act results in a violation of procedural due process and equal protection and, therefore, reverse the trial court's order requiring M.A. to register pursuant to the Act.

¶ 2                              Background

¶ 3    We summarize only so much of the evidence at trial as is necessary to an understanding of the issues presented on appeal. The incident that gave rise to these proceedings occurred on November 24, 2012. M.A. was at that time 13 years old. On the morning of November 24, M.A. and her older brother, age 14, were at their aunt's house in Chicago. M.A. and her brother got into an argument that morning about a missing shower cap. After her brother accused M.A. of being the last person to be seen with the shower cap, M.A. swore "on my grandfather" that she had not used it. The reference to the siblings' deceased grandfather angered M.A.'s brother and he went to the couch where M.A. was sitting and began punching her with his fists and pulling out her hair. Although the siblings' aunt tried to break up the fight, she was pushed away.

¶ 4    M.A.'s brother then went into a bedroom and closed the door. M.A. went into her aunt's kitchen, grabbed a knife and pushed her way into the bedroom. Although the manner in

which the injuries were inflicted and M.A.'s intent to inflict those injuries were contested at trial, it is undisputed that M.A. cut her brother twice on his face and arm, injuries that required 13 stitches. M.A.'s aunt then called the police. M.A. was thereafter charged in a juvenile petition with aggravated domestic battery, aggravated battery, battery and domestic battery.

¶ 5    Between the date of M.A.'s first court appearance and the sentencing hearing, M.A. was placed in a variety of residential placements, including with relatives and in group homes. M.A. could not continue to reside with her mother and brother because the Department of Children and Family Services (DCFS), which was conducting an investigation, prohibited her from having any contact with her brother. M.A. was generally noncompliant with court orders and house rules. She ran away from her various placements on a number of occasions, encountered disciplinary and attendance problems at school, and was charged in a new petition for stealing money from an aunt. Ultimately, in April 2013, after all other placement options had been exhausted, a family friend offered to take M.A. Reports following that placement indicated M.A.'s continued noncompliance with court-imposed restrictions as well as unexplained absences from the home, but the family friend reported that she was prepared to have M.A. reside with her until she turns 18 and that she is attempting to provide M.A. a more structured environment.

¶ 6    On May 2, 2013, the trial court adjudicated M.A. delinquent on all charges. On the same date, the court ordered a clinical evaluation for purposes of sentencing.

¶ 7    The clinical evaluation ordered by the trial court was prepared by psychologist Priscilla DuBois of the Cook County Juvenile Court Clinic. DuBois reviewed certain records and interviewed M.A. on two occasions, once for an hour and 15 minutes and later for 40 minutes. DuBois also interviewed M.A.'s mother for an hour and 45 minutes.

¶ 8    The report detailed a history of turbulent relationships among M.A.'s family members, and particularly between M.A. and the brother involved in the November 24, 2012 altercation.

¶ 9    M.A. is the youngest of three children born to her mother. At the time of the evaluation, she had an 18-year-old half-brother and a 15-year-old biological brother, the victim in this case. M.A.'s maternal grandfather also lived with the family until his death on March 25, 2011. M.A.'s mother admitted that her father's death hit her (the mother) hard and that she "pushed [her children] away emotionally." DCFS previously investigated M.A.'s mother on allegations of abuse on three occasions in the year prior to the incident involving M.A.'s brother, but determined the charges were unfounded.

¶ 10    M.A.'s mother reported to DuBois that she did not currently have a residence, but did not elaborate. She also told DuBois that M.A. and the brother involved in the altercation argued daily and "always fought" because the older brother tried to "be the boss of her." M.A. and her brother, according to their mother, punched, slapped and pushed each other. On two prior occasions, their fights left M.A. with a black eye. M.A. reported that fights with her brother often involved objects including an iron, skillet, bat, fork, spoon and crutches, but their fights have resulted in only minor scrapes and cuts. For her part, M.A.'s mother admitted that up until about a year before the altercation with her brother, she disciplined M.A. by giving her "woopins" involving spanking her with a belt or slapping her in the mouth. M.A.'s mother also applied a "rule of three" approach to discipline: if one child misbehaved, all three received a "woopin."

¶ 11     M.A. first began displaying behavior problems around the age of eight or nine. School reports indicated that she had frequent conflicts with peers, was confrontational with adults and had difficulty following school rules. Although she has had an "Individual Education Plan" to address a learning disability since the fifth grade and has received services from school counselors, she has never been evaluated by any mental health professional or received any formal mental health services or other therapy. M.A.'s mother reported that two of M.A.'s paternal aunts died in "mental institutions" and that she, her sisters and her mother have a history of suicide attempts. Most recently, M.A.'s mother attempted suicide about four years earlier. Although M.A. has on occasion threatened to harm herself, she has consistently denied any serious intention to do so.

¶ 12     M.A.'s mother believes M.A. would benefit from "Multi-Systemic Therapy"–an intensive, community-based network of "wrap-around" social services–and admitted that her whole family has "anger issues" and that they know how to trigger one another's anger. At the time of the evaluation, M.A. was not interested in attempting to repair her relationship with her mother.

¶ 13     M.A.'s mother admitted to smoking cannabis several times a month but denied that she smoked in front of her children. M.A. reported that her mother smoked "every other day" and had done so in front of her. The family friend who agreed to take M.A. in reported that M.A.'s mother smokes "every day." DuBois believed that M.A.'s mother's substance abuse would likely impede her ability to provide M.A. with consistent and effective parenting and the close monitoring necessary to reduce M.A.'s risk for engaging in negative behaviors.

¶ 14     DuBois concluded that M.A. had developed "poor coping skills" for managing "chronic family conflict" and "ineffective discipline and limited monitoring in the home." She observed that M.A.'s coping skills consist of "aggression directed at others" or "avoidance" by leaving her home. DuBois recommended individual therapy for M.A., eventual family therapy (while recognizing that implementation of the recommendation is hampered by the DCFS policy prohibiting M.A. from having contact with her brother and M.A.'s lack of desire to improve her relationship with her mother), substance abuse evaluation and grief counseling for M.A.'s mother, and a psychiatric evaluation for M.A. Given M.A.'s history of (i) impulsivity and aggression, (ii) family conflict and ineffective discipline, (iii) residential instability, and (iv) placement in care outside the family, as well as the family history of mental illness, DuBois concluded that M.A. is at risk for recidivism.

¶ 15     The court also received a social investigation from M.A.'s probation officer in which M.A.'s mother reported that M.A. and her brother have been "beating each other up since they were little kids." M.A.'s mother also admitted that when her children were younger, she was often out with her friends instead of spending time at home. According to M.A., the beatings she received from her brother increased after their grandfather died in 2011 because no one was ever around.

¶ 16     The trial court sentenced M.A. to 30 months' probation with certain conditions, one of which was to register under the Act. At the sentencing hearing, the trial court, in response to questions raised by M.A.'s mother regarding registration, stated: "[T]his is required under the law. This is not my order. Because of what you were found guilty of, you have to register." When discussing whether the obligation to register would terminate after five years, the trial court commented: "[T]hey do it for sex offenders with kids, you would think they would do it with this." After her sentencing, M.A. signed a form acknowledging her obligation to

register within five days. M.A.'s motion to reconsider the finding of delinquency was denied and she timely appealed.

¶ 17                                    The Act

¶ 18        The Act, which became effective June 27, 2006, is a sentencing statute. As it applies to juveniles, the Act defines a "violent offender against youth" as a person who is adjudicated a juvenile delinquent as the result of committing or attempting to commit an act which, if committed by an adult, would constitute any of the offenses enumerated in section 5(b) or (c-5).[1] 730 ILCS 154/5(a)(2) (West 2012). Subsection 5(b) defines a "violent offense against youth" to include a variety of offenses when the victim is under the age of 18, including aggravated domestic battery and aggravated battery. 730 ILCS 154/5(b)(4.4) (West 2012). The Act uses "conviction" and "adjudication" interchangeably. See 730 ILCS 154/5(a) (West 2012) ("For purposes of this Section, 'convicted' shall have the same meaning as 'adjudicated'."). The Act requires initial registration within five days after entry of the sentencing order based on the juvenile's adjudication (730 ILCS 154/10(c)(2) (West 2012)) and further provides that, within 10 days of attaining the age of 17, the offender must register as an adult (730 ILCS 154/5(a), 10(a) (West 2012)).

¶ 19        There is no provision in the Act for a juvenile offender to petition to be taken off the registry prior to the expiration of the 10-year period nor is there any provision that excuses the requirement to register as an adult. As a practical matter, therefore, any juvenile adjudicated delinquent of any of the enumerated offenses who is eight years old or older at the time of the adjudication will be required to register as an adult violent offender against youth. The older the juvenile is at the time of the offense, the longer the juvenile will remain on the statewide registry.

¶ 20        The offender must register in person and provide accurate information as required by the State Police, including "a current photograph, current address, current place of employment, the employer's telephone number, [and] school attended." 730 ILCS 154/10(a) (West 2012). The Act requires law enforcement to send the name, address, date of birth, school, place of employment and title of the offense to the school board in the offender's school district, the principal and guidance counselor at the offender's school and all child care facilities, institutions of higher learning and libraries in the county. 730 ILCS 154/95(a-2), (a-3), 100(b) (West 2012). There is no exception in the foregoing provisions for juvenile offenders. The Act also vests in law enforcement the discretionary authority to disclose the offender's information and any "other such information that will help identify the violent offender" to "any person likely to encounter a violent offender." 730 ILCS 154/95(b) (West 2012).

¶ 21        For offenses committed within the City of Chicago, the offender must register at Chicago police department headquarters. 730 ILCS 154/95(a-3) (West 2012). If the offender is employed or attends an institution of higher learning, he or she must register with the chief of police in the municipality where the offender is employed or attends school. 730 ILCS 154/10(a)(2)(i) (West 2012). If the offender is temporarily domiciled outside the jurisdiction

---

[1]Section 5(c-5) deals with first degree murder convictions of persons at least 17 years of age at the time of the offense and is not relevant to this discussion. 730 ILCS 154/5(c-5) (West 2012).

of registration for an aggregate period of five or more days during any calendar year, he or she must separately register in that jurisdiction. 730 ILCS 154/10(a)(2) (West 2012).

¶ 22    A violation of any of the registration requirements carries with it an automatic extension of the 10-year registration period measured from the date of the violation. 730 ILCS 154/40 (West 2012). Failure to register is a Class 3 felony (730 ILCS 154/60 (West 2012)) and any subsequent violations are Class 2 felonies (*id.*).

¶ 23    Nothing in the Act defines "registration" differently for juveniles compared to adults. A fair reading of the Act–and one adopted by the parties as well as the trial court–is that the Act's registration provisions apply equally to both. Information in the registry is maintained on a statewide database and is publicly accessible via a website. 730 ILCS 154/85(a)-(b) (West 2012). Anyone accessing the public registry can obtain the name, date of birth, address, photograph and other personal information about the offender, the title of the conviction or adjudication and a summary of the offense. *Id.* Although there are separate "notification" provisions regarding juvenile offenders (730 ILCS 154/100 (West 2012)), from which it might be inferred that something less than inclusion on the statewide registry is contemplated, no provision of the Act expressly so states. It is only by consulting the Illinois Administrative Code that one can discern that placement on the statewide registry will not occur until after the juvenile offender registers as an adult after turning 17. 20 Ill. Adm. Code 1283.50(j) (2010) ("Upon registering as an adult, the juvenile offender will be placed on the Illinois State Police Violent Offender Against Youth Registry website after an authorization letter is signed by the offender and received by the Illinois State Police.").

¶ 24                                        Analysis

¶ 25    M.A. does not challenge on appeal her adjudication or the sufficiency of the evidence to support that adjudication. The issues M.A. raises are limited to constitutional challenges to the Act. M.A. contends that the automatic application of the Act to juvenile offenders violates both substantive and procedural due process rights. She further claims that the Act, as applied to juvenile offenders, results in a denial of equal protection given that the Act treats juvenile violent offenders more harshly than juvenile sex offenders. We address each argument in turn.

¶ 26    At the outset, we note that the constitutional arguments M.A. raises on appeal were not raised in the trial court. But given that the constitutionality of a statute may be raised for the first time on appeal (*In re J.W.*, 204 Ill. 2d 50, 61 (2003)), we will nevertheless consider these issues. The constitutionality of the Act is an issue of first impression in Illinois.

¶ 27    "Statutes are presumed constitutional," and "[t]he party challenging the constitutionality of a statute carries the burden of proving that the statute is unconstitutional." *People v. Hollins*, 2012 IL 112754, ¶ 13. "Moreover, this court has a duty to construe the statute in a manner that upholds the statute's validity and constitutionality, if it can reasonably be done." *People v. Aguilar*, 2013 IL 112116, ¶ 15; see also *Hope Clinic for Women, Ltd. v. Flores*, 2013 IL 112673, ¶ 33 ("when assessing the constitutional validity of a legislative act, we must begin with the presumption of its constitutionality"). The constitutionality of a statute presents a question of law. *Aguilar*, 2013 IL 112116, ¶ 15.

¶ 28    In recent years, the United States Supreme Court has recognized that the unique characteristics of juveniles warrant heightened scrutiny in the context of convictions for criminal offenses. In a series of decisions, the Court has determined that the eighth

amendment's proscription against cruel and unusual punishment prevents imposition of the death penalty for offenses committed by juveniles (*Roper v. Simmons*, 543 U.S. 551, 574-75 (2005)), a sentence of life imprisonment without the possibility of parole for juveniles convicted of nonhomicide offenses (*Graham v. Florida*, 560 U.S. 48, 74-75, (2010)), and a mandatory sentence of life without the possibility of parole for homicide committed by a juvenile (*Miller v. Alabama*, 567 U.S. ___, ___, 132 S. Ct. 2455, 2469 (2012)). In each of these cases, the Supreme Court relied on the results of scientific and sociological studies documenting the fundamental differences between juvenile and adult offenders convicted of the same crimes. As summarized by the Court in *Miller*:

> "First, children have a ' "lack of maturity and an underdeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S., at 569. Second, children 'are more vulnerable ... to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid.* And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' *Id.*, at 570." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464.

Youth "is a time of immaturity, irresponsibility, 'impetuousness[,] and recklessness.' " *Id.* at ___, 132 S. Ct. at 2467 (quoting *Johnson v. Texas*, 509 U.S. 350, 368 (1993)). These "signature qualities" of youth are all "transient." *Johnson*, 509 U.S. at 368. See also *People v. Davis*, 2014 IL 115595, ¶ 39 (recognizing that *Miller* declares a new substantive rule that applies retroactively).

¶ 29    The State dismisses the foregoing authorities as inapposite because they concern the issue of whether sentences imposed on juveniles violate the eighth amendment's prohibition against cruel and unusual punishment whereas this case deals with a registration requirement similar to one our supreme court has determined does not constitute "punishment." *In re J.W.*, 204 Ill. 2d 50, 75 (2003) (finding that requiring a juvenile to register under the Sex Offender Registration Act (730 ILCS 150/1 *et seq.* (West 2000)) for the rest of his natural life did not constitute "punishment"). But as discussed in more detail below, we find the Supreme Court's observations about the nature of juvenile offenders particularly applicable in the context of this case.

¶ 30                                          M.A.'s Obligation to Register

¶ 31    We first address the Act's registration requirement in light of the dissent's conclusion that registration is "postponed" until the offender reaches 17, a fact the dissent characterizes as a legislative "concession" that ameliorates the effect of the Act on juvenile offenders. The dissent reasons, based on section 5(a)'s "shall be considered as having committed" language, that a juvenile offender is not considered to have committed a violent offense against youth until the offender turns 17 and only then is "registration" required. 730 ILCS 154/5(a) (West 2012) ("a person who is defined as a violent offender against youth as a result of being adjudicated a juvenile delinquent *** upon attaining 17 years of age shall be considered as having committed the violent offense against youth on or after the [offender's] 17th birthday"). Acknowledging that nothing in the Act distinguishes between adults and juveniles in terms of registration requirements, the dissent nevertheless concludes that "registration"

for juveniles is something different and urges trial judges to "clarify" this point, perhaps by using different language in requiring juveniles to "register." Neither the parties nor the trial court interprets the Act in this manner.

¶ 32 We, too, are unable to reconcile this interpretation with the Act's plain language. In unambiguous terms, the Act requires a juvenile adjudicated delinquent of an offense constituting a "violent offense against youth" to "register" within five days of her adjudication and to provide the Illinois State Police the information specified in section 10 of the Act, the same information adult offenders are required to provide. 730 ILCS 154/10(a) (West 2012). The form M.A. signed after her sentencing advised her of her obligation to "register." Our supreme court has determined that similar provisions of the Sex Offender Registration Act (730 ILCS 150/1 *et seq.* (West 2000)) (Registration Act) apply to juveniles. See *In re J.W.*, 204 Ill. 2d at 66 ("Clearly, then, juvenile sex offenders do fall within the purview of section 3 of the Registration Act and are required to register."); *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 201 (2009) ("[T]he minor is required to register under the Act as a result of his delinquency adjudication of criminal sexual assault.").[2] The Act does not exempt juvenile offenders from penalties, including an automatic extension of the 10-year registration period, for failing to register. 730 ILCS 154/60 (West 2012). If M.A., like any other offender on the registry, leaves the jurisdiction of her registration for an aggregate period of five days or more during a calendar year, she must register in the new jurisdiction. 730 ILCS 154/10(a)(2) (West 2012).

¶ 33 Thus, although M.A.'s information may not be available to the general public via the Internet until after she reaches 17 and is automatically required, without any further hearing, to register as an adult, she is nonetheless subject to the Act's registration requirements, including the penalties for failing to comply with those requirements. What is postponed is not registration, but public dissemination of the information contained on the registry. With the registration framework in mind, we now address M.A.'s constitutional arguments.

¶ 34                              Substantive Due Process
¶ 35 M.A first contends that the Act violates substantive due process. M.A. argues that the automatic application of the Act to juveniles ignores the transitory qualities and capacity for rehabilitation that distinguish juveniles from adults. Further, M.A. urges that the Act's registration requirements actually hinder rehabilitative efforts since they guarantee that juvenile adjudications labeling juveniles "violent offenders against youth" will hinder the offender's ability to obtain employment or pursue higher education, particularly after the offender is automatically required to register as an adult.

¶ 36 A substantive due process challenge is appropriate where a statute impermissibly restricts a person's life, liberty or property interest. *People v. R.G.*, 131 Ill. 2d 328, 342 (1989). The

---

[2]Contrary to the dissent's conclusion, the court in *People v. Evans*, 405 Ill. App. 3d 1005 (2010), did not determine that a juvenile convicted of murder was exempt from the Act's registration requirements. Rather, the court declined to decide the issue given that the adult defendant's obligation to register was not excused: "Whether [the juvenile principal] is required to register under the Violent Offender Act is disputed, *but we need not decide the question*, because even if [the juvenile principal] is not required to register ***, defendant has presented nothing that excuses him from registering simply because he was convicted on an accountability theory." (Emphasis added.) *Id.* at 1009.

showing required to justify governmental intrusion depends on the nature of the right involved. Where a statute substantially infringes on an individual's freedom of choice with respect to "certain basic matters of procreation, marriage, and family life" (*Kelley v. Johnson*, 425 U.S. 238, 244 (1976)), "then any statute limiting that right 'may be justified only by a "compelling state interest," [citations] and *** must be narrowly drawn to express only the legitimate state interests at stake' " (*People v. R.G.*, 131 Ill. 2d at 342 (quoting *Roe v. Wade*, 410 U.S. 113, 155 (1973))). In the absence of a fundamental right, the statute need only bear a rational relationship to the legislative purpose prompting its enactment. *People v. R.G.*, 131 Ill. 2d at 342.

¶ 37    In *In re J.W.*, our supreme court addressed a substantive due process challenge to the registration provisions of the Registration Act. In that case, a 12-year-old boy was adjudicated delinquent of aggravated criminal sexual assault. As a condition of his five-year probation, he was required to register as a sex offender. Given the nature of the offenses involved, the juvenile offender was classified under the Registration Act as a "sexual predator" and required to register for the rest of his natural life.

¶ 38    The minor in *In re J.W.* did not claim that the Registration Act infringed on a fundamental right. Analyzing the impact of the Registration Act under the rational basis test, the court observed that "a statute need only bear a rational relationship to the purpose the legislature sought to accomplish in enacting the statute." *In re J.W.*, 204 Ill. 2d at 67. Where the statute bears a reasonable relationship to the public interest to be served and "the means adopted are a reasonable method of accomplishing the desired objective," the statute must be upheld. (Internal quotation marks omitted.) *Id.* The statute need not be the best means of accomplishing the stated objective and courts will not second-guess the wisdom of legislative enactments or dictate alternative means to achieve the desired result. *Id.* at 72 (citing *People ex rel. Lumpkin v. Cassidy*, 184 Ill. 2d 117, 124 (1998)).

¶ 39    Applying the foregoing principles to the Registration Act, the court concluded that "there is a rational relationship between the registration of juvenile sex offenders and the protection of the public from such offenders." *In re J.W.*, 204 Ill. 2d at 72. The court further found that the lifetime registration requirement was reasonable in light of the "strict limits placed upon access to [the juvenile's] information. Whether there are better means to achieve this result, such as limiting the duration of registration for all juvenile sex offenders, including juvenile sexual predators, is a matter better left to the legislature." *Id.*

¶ 40    Since our supreme court decided *In re J.W.*, other courts have reached contrary conclusions. See *In re C.P.*, 131 Ohio St. 3d 513, 2012-Ohio-1446, 967 N.E.2d 729 (concluding that automatic lifetime registration for juveniles violates the eighth amendment's prohibition against cruel and unusual punishment and the fourteenth amendment's guarantee of due process); *In re J.B.*, No. CP-67-JV-0000726-2010, 1, 34 (Pa. Ct. Comm. Pl. of York County Nov. 4, 2013) ("[L]ifetime registration *** is particularly harsh for juveniles in light *** of *** the detrimental effects that registration can have on all aspects of their lives and livelihood.").

¶ 41    We further note that the Illinois Juvenile Justice Commission has recently released its report, "Improving Response to Sexual Offenses Committed by Youth" (Report), in which the Commission recommends a reassessment of Illinois' current practice of requiring juveniles to register as sex offenders. The Report analyzes extensive data regarding the efficacy of registration to enhance public safety and details collateral adverse consequences

of registration requirements for juvenile sex offenders, summarizing its conclusions as follows: "[T]he evidence is clear and growing: treating youth like adults and categorically applying registries and other barriers to stable housing, education, family relationships, and employment does not protect public safety. On the contrary, employing these strategies is much more likely to undermine youth rehabilitation, harm intrafamilial victims of sexual abuse, stigmatize families, and produce poor outcomes for communities." Illinois Juvenile Justice Commission, Improving Response to Sexual Offenses Committed by Youth 50 (2014), *available at* http://ijjc.illinois.gov/youthsexualoffenses. The Report also points out that Illinois is among a minority of states that imposes categorical registration requirements on all juveniles convicted of sex offenses, regardless of the juvenile's age at the time of the offense. *Id.* at 52. The Commission recommends removing juveniles from the state's sex offender registry. *Id.* at 59.

¶ 42    Whether the legislature will act on the Commission's recommendations remains to be seen. Unless and until that happens, *In re J.W.* guides the analysis of the issue of whether the Act's provisions bear a rational relationship to the protection of the public.

¶ 43    While in *In re J.W.*, the juvenile offender did not claim that the Registration Act impaired any fundamental constitutional right, here M.A. claims that the Act infringes on two fundamental constitutional rights: her right to liberty under the federal and state constitutions and her right to privacy under the Illinois Constitution. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §§ 2, 6. If M.A. is correct, the constitutionality of the Act would be subject to the more rigorous strict scrutiny test. See *People v. R.G.*, 131 Ill. 2d at 342.

¶ 44    We do not agree that the Act impairs fundamental constitutional rights. First, regarding M.A.'s claim that the Act impairs her interest in "liberty," nothing in the requirement that juvenile offenders register deprives them of their freedom. See *In re T.C.*, 384 Ill. App. 3d 870, 875 (2008) ("T.C. has failed to show how the requirements of [the Sex Offender Registration Act] deprive him of a protected liberty interest ***."). Registration does not impair an offender's ability to work or go to school, although, as we discuss below, it may make the ability to do either more difficult. By the same token, an offender required to register is free to move anywhere, again subject to the Act's ongoing requirements to register in another jurisdiction. Thus, the requirement to register does not, in and of itself, impair an offender's liberty.

¶ 45    Likewise, M.A.'s argument that the Act infringes on her right to privacy under the Illinois Constitution is misplaced. The right to privacy made explicit in the Illinois Constitution affords protection against "unreasonable" invasions of privacy. See *Kunkel v. Walton*, 179 Ill. 2d 519, 538 (1997) ("The text of our constitution does not accord absolute protection against invasions of privacy. Rather, it is *unreasonable* invasions of privacy that are forbidden." (Emphasis in original.)). As we have discussed above, as it impacts juvenile offenders prior to the time they reach 17, the Act contemplates limited dissemination of registry information by law enforcement authorities. Given the need to protect the public from violent offenders against youth, whether such offenders are adults or juveniles, we cannot say that the intrusion on the privacy of juvenile offenders contemplated by the Act is unreasonable. See *In re Lakisha M.*, 227 Ill. 2d 259, 280 (2008) (minimally intrusive nature of privacy invasion required for buccal swab coupled with juvenile's diminished expectation of privacy as a result of her delinquency adjudication rendered invasion of privacy reasonable; court also noted limited dissemination of collected information). Further,

assuming the validity of the automatic requirement to register as an adult upon reaching 17–an issue we discuss in detail below–the Act does not unreasonably impair an adult offender's right to privacy given the important countervailing considerations of public safety. See *People v. Cornelius*, 213 Ill. 2d 178, 196 (2004) (adult required to register under the Registration Act has no "cognizable privacy interest in his sex offender registry information"). Consequently, we decline to apply a strict scrutiny analysis to the Act's registration requirements.

¶ 46　　But despite the conclusion that the Act does not deprive juveniles required to register of a fundamental constitutional right, the Act's registration requirements burden a juvenile offender's liberty in that the freedom to live, work or attend school is accompanied by the requirement to register with law enforcement authorities and the failure to comply carries with it significant criminal penalties. And although the Act does not eliminate completely a juvenile's right to privacy, it does mandate disclosure of information normally deemed confidential under the Juvenile Court Act of 1987 (705 ILCS 405/1-7, 1-8 (West 2012)).

¶ 47　　Further, the persons to whom such information is disclosed–principals, school counselors and others–are not themselves under any statutory mandate to maintain its confidentiality, allowing for potentially broader dissemination than contemplated under the Act. Thus, because the Act undeniably affects a juvenile offender's liberty and privacy (without depriving the offender of those rights altogether), we will determine whether the Act survives scrutiny against a substantive due process challenge under the rational basis test.

¶ 48　　We believe the decision in *In re J.W.* compels the conclusion that the Act's registration requirements pass the rational basis test. Just as our supreme court concluded that there is a rational relationship between the registration requirements for sex offenders, regardless of age, and the protection of the public from those offenders (*In re J.W.*, 204 Ill. 2d at 72), the same reasoning compels the finding that a rational relationship exists in the context of this case. The public requires protection from violent offenders against youth; this is true whether the offender is an adult or a juvenile. The degree of protection required may vary given, among other things, the age of the offender at the time the offense is committed. In recognition of this fact and consistent with the Juvenile Court Act's statutory confidentiality provisions (705 ILCS 405/1-7, 1-8 (West 2012)), the legislature has deemed it appropriate to limit those who have access to a juvenile offender's information contained on the registry, while making the same information for adult offenders widely available. Given our conclusion that under the rationale of *In re J.W.*, the Act's registration requirements are rationally related to public safety, we reject M.A.'s substantive due process challenge.

¶ 49　　　　　　　　　　　　　　Procedural Due Process

¶ 50　　M.A. also contends that the Act results in a deprivation of procedural due process. Pointing to the mandatory 10-year minimum period of registration and the automatic requirement to register as an adult on reaching 17, she argues that the Act deprives her of any meaningful sentencing hearing before being required to register as a juvenile and, later, as an adult. Again, given our conclusion that the Act's registration provisions do not infringe on fundamental rights, we will analyze them under the rational basis test.

¶ 51　　"Procedural due process claims challenge the constitutionality of the specific procedures used to deny a person's life, liberty, or property." *Konetski*, 233 Ill. 2d at 201. The hallmarks of procedural due process are notice and the opportunity to be heard. *Tri-G, Inc. v. Burke*,

*Bosselman & Weaver*, 222 Ill. 2d 218, 244 (2006). Courts considering procedural due process challenges consider the following factors:

> " 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 277 (2004) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

¶ 52    As we have noted, the Act requires juveniles adjudicated as violent offenders against youth to automatically register as adults upon turning 17 regardless of the nature and circumstances of the adjudication, which, in many cases, will have occurred several years prior to the minor's seventeenth birthday. As the Supreme Court recognized in *Miller*, "[O]ur history is replete with laws and judicial recognition that children cannot be viewed simply as miniature adults. *** [I]t is the odd legal rule that does *not* have some form of exception for children." (Emphasis in original and internal quotation marks omitted.) *Miller*, 567 U.S. at ___, 132 S. Ct. at 2470. "[C]riminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Graham*, 560 U.S. at 76.

¶ 53    Consideration of the foregoing factors compels the conclusion that the Act, with its mandated registry for 10 years and its requirement that juvenile offenders automatically register as adults upon turning 17, denies minors procedural due process. The Act's registration requirements are mandatory and admit of no exceptions. Once a juvenile is adjudicated delinquent of any of the offenses enumerated in the Act, registration is required regardless of the circumstances of the offense. Further, without any individualized assessment of whether the offender poses any continuing risk to the public, the Act automatically requires offenders to register as adults, with the attendant inclusion of their information on the statewide public registry. Unlike adults, juveniles have no right to a jury trial before being ordered to register as adults. Thus, in its application to juvenile offenders required to register as adults, the Act affords minors *less* procedural protection than their adult counterparts. Finally, as in M.A.'s case, adult registration may occur several years after the delinquency adjudication and is required without any opportunity for further hearing.

¶ 54    While the rational basis test might support an initial registration requirement for all juvenile offenders classified as "violent offenders against youth" under the Act without an individualized assessment as to whether those minors, in fact, pose a danger to the public (particularly in light of the limited dissemination of registration information), it does not likewise justify the requirement that all such offenders automatically register as adults, with the ensuing disclosure of registration information to the public at large. This is particularly true given that no hearing is conducted prior to mandated adult registration. While our supreme court has recognized that amendments to the Juvenile Court Act (705 ILCS 405/5-101 (West 2012)) were designed to shift the exclusive focus in juvenile proceedings from rehabilitation to include protection of the public and accountability of juvenile offenders, delinquency proceedings remain protective in nature. See *In re Jonathon C.B.*, 2011 IL 107750, ¶ 94 (" '[E]ven as the legislature recognized that the juvenile court system should protect the public, it tempered that goal with the goal of developing minors into productive adults, and gave the trial court options designed to reach both goals.' " (quoting

*In re Rodney H.*, 223 Ill. 2d 510, 520 (2006))); *In re Rodney H.*, 223 Ill. 2d at 520 (Even after amendments to the Act, " 'the purpose of the Act is to correct and rehabilitate, not to punish.' *In re W.C.*, 167 Ill. 2d 307, 320 (1995); [citations]."). Further, one of the Juvenile Court Act's express purposes is "[t]o provide due process, as required by the Constitutions of the United States and the State of Illinois, through which each juvenile offender and all other interested parties are assured fair hearings at which legal rights are recognized and enforced." 705 ILCS 405/5-101 (West 2012). The Act's automatic requirement that juvenile offenders register as adults without exception runs counter to these goals.

¶ 55    M.A.'s circumstances illustrate the issue perfectly. Having been classified as a "violent offender against youth" at age 13, M.A. was the subject of a clinical evaluation provided to the trial court. The psychologist who prepared the evaluation interviewed M.A. for just under two hours and conducted no psychological tests. The report is replete with conflicting and incomplete information regarding M.A.'s family (*e.g.*, the reason for her mother's reported homelessness and the frequency of her substance abuse, the family's history of mental illness) and M.A. (whether M.A. has herself abused alcohol or other substances, the nature of M.A.'s learning disability–the report refers to M.A. receiving "academic support under an emotional disorder," and how frequently she was beaten by her brother). While the report was certainly sufficient for purposes of sentencing a 13-year-old, it is clearly insufficient to support any conclusions or predictions about M.A. several years into the future.

¶ 56    Prior to M.A.'s being required to register as an adult, no court will have an opportunity to determine whether the services recommended for M.A., her mother and her family in the clinical evaluation have been beneficial; no court will inquire whether the more structured environment provided by the family friend has lessened M.A.'s tendencies toward oppositional behavior and aggression; no court will determine whether M.A.'s anger and aggression are symptomatic of undiagnosed mental health conditions, a product of her dysfunctional home environment or a combination of both. And most importantly, M.A. will have no opportunity to be heard on the issue. Simply put, were the issue presented anew on M.A.'s seventeenth birthday, no court would reasonably rely on a four-year-old clinical evaluation to justify a decision of any significance to M.A.'s future, much less one that would expose her juvenile history to the public at large. But that is the result the Act mandates.

¶ 57    The risk of error in the statutory scheme is obvious. A stale clinical evaluation prepared after brief interviews cannot reasonably support any conclusions about a juvenile offender's development since her adjudication or serve as a basis to predict that she either is or will continue to be a danger to the public. There is also no basis to conclude–on a wholesale basis–that minors adjudicated delinquent of offenses defined to constitute "violent offenses against youth" will continue throughout their adolescence and early adulthood to present a continuing danger to society.

¶ 58    Again, M.A.'s circumstances present a textbook example of the risk of error posed by the Act's broad brush approach. Despite her many behavior problems, this was M.A.'s first referral to juvenile court. The altercation that brought her there was not with a classmate or a stranger on the street, but with an older brother who, according to the clinical evaluation, physically assaulted her on a regular basis for years. M.A.'s mother could be deemed largely responsible for this learned behavior given her reported use of physical discipline on her children, her regular substance abuse, her admitted absences from the home and her

- 13 -

emotional distance from M.A. after her father died. Although M.A. has had the benefit of special education and school counseling services, these are woefully inadequate to offset her toxic home environment. And as far as the record shows, M.A. has never been fully assessed by a mental health professional competent to determine whether treatment, alone or in combination with medication, could address her behavior problems.

¶ 59 It is not difficult to understand that a child suffering regular beatings at the hands of family members would lash out. We would also expect a child who has been removed from her home and placed in a variety of group homes or relative placements because of a fight she did not start to experience a fair amount of anger and acting out. But in its mechanical application to all juveniles in M.A.'s circumstances, the Act takes none of this into account. This cannot be reconciled with due process protections. See *Graham*, 560 U.S. at 76 (laws that fail to take youthfulness into account are "flawed"); *Miller*, 567 U.S. at ___, 132 S. Ct. at 2470 ("a sentencing rule permissible for adults may not be so for children"). "It is the youth's lack of maturity and experience, impetuosity, and ill-considered decisions which mandate special consideration by the court in determining the protections available to minors in juvenile proceedings, and the avenues for review and relief where the minor's rights are violated." *In re J.T.*, 221 Ill. 2d 338, 380-81(2006) (Freeman, J., dissenting).

¶ 60 It is likewise apparent that putting in place procedures to assure that juvenile offenders who do not pose a danger to society are not required to register as adults would entail no administrative burdens. The court presiding over M.A.'s delinquency matters will no doubt conduct regular status hearings to gauge M.A.'s compliance with the conditions of probation and whether the services recommended in the clinical evaluation have been made available to M.A. and her family. Requiring the court to conduct a hearing prior to M.A.'s seventeenth birthday in order to determine whether M.A. should be required to register as an adult and, more significantly, allowing M.A. the opportunity to be heard on the issue, will impose no undue burden.

¶ 61 The truth of this conclusion is best illustrated by the amendments to the Registration Act applicable to juvenile sex offenders. In 2007, the Registration Act was amended to (i) eliminate the requirement for juvenile sex offenders to register as adults upon turning 17 (730 ILCS 152/121 (West 2008)) and (ii) allow juvenile sex offenders to petition to be taken off the sex offender registry after five years (730 ILCS 150/3-5(c) (West 2008)). In connection with the latter amendment, juvenile sex offenders are afforded the right to counsel during such hearings and to demonstrate by a preponderance of the evidence, including an independent risk assessment, that they pose no risk to the community. *Id.* Our supreme court has recognized that these amendments "significantly reduce the impact of the minor's registration requirement." *Konetski*, 233 Ill. 2d at 203; see also *In re Jonathon C.B.*, 2011 IL 107750, ¶ 106.

¶ 62 The supreme court has also recognized that the amendments to the Registration Act were prompted by the legislature's recognition that "in many instances, juveniles who engage in sexually inappropriate behavior do so because of immaturity rather than predatory inclinations. The purpose of the termination provisions of [the Registration Act] is to afford juveniles the opportunity to demonstrate this is true in an individual case, and to prove that they do not pose a safety risk to the community." *In re S.B.*, 2012 IL 112204, ¶ 29. Although the dissent points to the legislative history of the amendments indicating that they were designed to ameliorate the negative collateral effects of sex offender registration in the

context of consensual sex between minors, nothing in the language of the amendments so limits their application.

¶ 63    Again, the circumstances of M.A.'s case illustrate perfectly why such procedural protections are required. That M.A. is indeed immature is obvious; the clinical evaluation establishes that like most 13-year-olds she is impulsive, reactive and unable to appreciate the risks associated with her behavior. On the other hand, the record contains no basis to conclude that she will retain these immature qualities for the next four years and that, as a young adult, she will pose any danger to the public at large. We can discern no reason why juveniles classified as violent offenders against youth are not entitled to an individualized hearing prior to the expiration of the 10-year registration period and prior to being required to register as adults.

¶ 64    Significantly, the court in *Konetski* determined that the amendments allowing minor sex offenders to remain on the juvenile registry as well as to seek termination of their registration obligation altogether were "sufficient to satisfy the minor's constitutional right to procedural due process." *Konetski*, 233 Ill. 2d at 206. Given that the legislature has already determined that these additional protections for juvenile sex offenders are warranted, it follows that affording them to juvenile violent offenders against youth would not unduly burden the juvenile justice system. The corollary is also true: failing to provide these protections to minors adjudicated violent offenders against youth results in a denial of procedural due process to this class of offenders.

¶ 65    As the United States Supreme Court recognized in *Roper*, *Graham*, and *Miller*, the hallmark of youth is its transitory nature. By automatically carrying over the consequences of a juvenile adjudication into M.A.'s adult life, the Act guarantees that the qualities of recklessness and irresponsibility that characterized her conduct as a 13-year-old will haunt M.A. well into her adulthood. Inclusion on the publicly available adult registry will no doubt burden M.A.'s efforts to obtain employment and pursue higher education. Although the Juvenile Court Act protects the confidentiality of law enforcement and court records relating to juvenile adjudications (705 ILCS 405/1-7, 1-8 (West 2012)), information regarding M.A.'s offense now "considered as having [been] committed" as an adult (730 ILCS 154/5(a) (West 2012)) will be publicly available. That this result is accomplished without any opportunity for M.A. to demonstrate that public safety will not be served by requiring her to register as an adult cannot be reconciled with due process protections and bears no rational relationship to the Act's purpose. Consequently, we find that the Act's provisions mandating registration of juvenile violent offenders against youth as adults and the failure of the Act to provide any means by which a juvenile offender can petition to be taken off the registry are unconstitutional.

¶ 66                                      Equal Protection

¶ 67    Finally, M.A. argues that the Act denies juvenile offenders against youth equal protection compared to juvenile sex offenders. U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 2. Pointing to the 2007 amendments to the Registration Act referenced above, M.A. contends that the Act treats juvenile violent offenders against youth differently and much more harshly than similarly situated juvenile sex offenders.

¶ 68    An equal protection challenge to legislation asks whether the government is treating similarly situated individuals in a similar manner. *People v. Breedlove*, 213 Ill. 2d 509, 518

(2004). "[T]he equal protection clause does not forbid the legislature from drawing proper distinctions in legislation among different categories of people." *Id.* In cases where fundamental rights are not at issue, the classification need only bear a rational relationship to the purpose of the statute. *People v. Whitfield*, 228 Ill. 2d 502, 512 (2007). A court need not reach the rational basis test where the party challenging the classification cannot meet the threshold requirement of demonstrating that she and the group she compares herself to are similarly situated. *Id.* at 512-13.

¶ 69    The State contends that M.A. cannot meet the threshold requirement of similarity between groups because juvenile violent offenders against youth are not "similarly situated" to juvenile sex offenders. Clearly, the offenses with which the two groups of juveniles are charged are different and require proof of different elements and in that sense, the two groups are not similarly situated. But for purposes of M.A.'s equal protection argument, we believe the appropriate class of persons is juvenile offenders who, as a result of a juvenile adjudication, are required to register with law enforcement authorities. In this context, it is apparent that juveniles required to register as sex offenders under the Registration Act are treated differently–and much more leniently–than juveniles required to register as violent offenders against youth. One group is relieved of the obligation to register as adults on turning 17 and is afforded the opportunity to demonstrate after five years that their obligation to register should be terminated because continuing registration does not serve public safety; the other group is not.

¶ 70    Because we find that M.A. satisfies the threshold showing of disparate treatment of similarly situated juveniles, we must next consider whether there is a rational relationship between that treatment and the purpose of the Act. The goal of the registration requirements for sex offenders and violent offenders against youth is the same: protection of the public. As applied to juveniles required to register under either act, we must also take into account the stated purposes of the Juvenile Court Act, which, as noted, in addition to holding juveniles accountable for their conduct, seeks to (i) rehabilitate and develop minors into productive adults and (ii) provide constitutionally required due process and "fair hearings at which legal rights are recognized and enforced." 705 ILCS 405/5-101 (West 2012).

¶ 71    If the disparate treatment is at odds with the stated legislative purposes, the classification violates equal protection. *Jacobson v. Department of Public Aid*, 171 Ill. 2d 314, 328 (1996) (finding that provisions of the Illinois Public Aid Code requiring parents of 18- to 21-year-olds living at home to reimburse the Department of Public Aid for welfare benefits paid to the children, while parents of children not living at home were not required to reimburse the Department, ran contrary to Public Aid Code's goal of maintaining and strengthening the family unit: "[T]he distinction drawn by [the challenged section] provides households with a direct financial incentive to cast out their 18- through 20-year-old children who are in need. *** There is no conceivable way such an arrangement can serve to strengthen family unity.").

¶ 72    The goals of protecting the public as well as the stated purposes of the Juvenile Court Act are served by the amendments to the Registration Act excusing juvenile sex offenders from registering as adults on turning 17 and enabling those juveniles to petition to be taken off the registry after five years. Such provisions allow for the possibility of rehabilitation and maintain the confidentiality of juvenile adjudications, while simultaneously permitting a

court in an appropriate case to determine that protection of the public justifies requiring the offender to remain on the registry.

¶ 73     We can see no rational basis for concluding that those same legislative purposes would not be equally well-served by affording these identical procedural protections to juvenile violent offenders against youth. Stated differently, we cannot discern any rational basis related to protection of the public served by requiring every juvenile offender against youth to register as an adult on turning 17 and in prohibiting such offenders from ever demonstrating to a court that public safety is not served by requiring them to remain on the registry. We therefore find that the legislature's disparate treatment of juvenile offenders required to register as the result of a delinquency adjudication of a violent offense against youth results in a denial of equal protection and, for this additional reason, those provisions are unconstitutional.

¶ 74                                   CONCLUSION

¶ 75     For the foregoing reasons, we declare that the registration provisions of the Violent Offender Against Youth Registration Act (730 ILCS 154/5(a)(2), 10 (West 2012)) are unconstitutional as a violation of procedural due process and equal protection and, therefore, reverse the trial court's order requiring M.A. to register under the Act.

¶ 76     Reversed.

¶ 77     JUSTICE PUCINSKI, concurring in part and dissenting in part.

¶ 78     I concur only in the majority's holding that the Act does not violate substantive due process.

¶ 79     I dissent from the majority's holdings that the Act violates procedural due process and equal protection.

¶ 80     First, however, I set forth provisions of the Act and the Illinois Administrative Code to clarify how the Act actually functions, as it is less than clear.

¶ 81     Adult violent offenders against youth are required to register on the *statewide registry*, and adult violent offenders are also subject to *community* notification. Section 10(c)(2) of the Act requires that "any person convicted on or after the effective date of this Act shall register in person within 5 days after the entry of the sentencing order based upon his or her conviction." 730 ILCS 154/10(c)(2) (West 2012). Section 10(b) also provides that "[a]ny violent offender against youth *** shall, within 5 days of beginning school, or establishing a residence, place of employment, or temporary domicile in any county, register in person as set forth in subsection (a) or (a-5)." 730 ILCS 154/10(b) (West 2012). When adult violent offenders register, their information is input into the Illinois State Police Law Enforcement Agencies Data System (LEADS) by local law enforcement. See 730 ILCS 154/10(a)(1), (a)(2)(i), (a)(2)(ii) (West 2012). The Illinois State Police then examines its LEADS database to identify violent offenders against youth and places them on the "Statewide Murderer and Violent Offender Against Youth Database," which is publicly available on the Internet. See 730 ILCS 154/85 (West 2012). The Illinois State Police maintains the "Statewide Murderer and Violent Offender Against Youth Database for the purpose of identifying violent offenders against youth and making that information available to the persons specified in

Section 95." 730 ILCS 154/85(a) (West 2012). For adults, upon registering and being placed on the statewide registry, there is also *community* notification of the identity of adult violent offenders. 730 ILCS 154/95 (West 2012).

¶ 82    Section 95 requires community notification of adult violent offenders against youth on the statewide registry and directs that, for the City of Chicago, the community notification provision under the Act mandates the Chicago police department to disseminate this same information, the name, address, date of birth, place of employment, school attended, and offense or adjudication of violent offenders against youth, to the same entities, namely, the school boards of public school districts and the principals of nonpublic schools within Cook County, child care facilities, boards of institutions of higher education and libraries, concerning violent offenders against youth required to register under section 10. 730 ILCS 154/95(a-3) (West 2012). Section 95 only applies, however, to the "violent offenders against youth required to *register* under Section 10 of this Act [(730 ILCS 154/10)]." (Emphasis added.) 730 ILCS 154/95(a), (a-2), (a-3) (West 2012).

¶ 83    Unlike adults, youth violent offenders face a two-step process under the Act for both registration and notification: (1) first, for juveniles under 17; and then (2) once juveniles attain the age of 17.

¶ 84    First, juveniles under 17 are not required to actually "register" on the statewide, publicly available, Illinois Murderer and Violent Offender Against Youth Registry, and their information is not subject to community-wide notification, until they reach the age of 17. Prior to the age of 17, the juvenile provides his or her registration information in a "registration form" to local law enforcement only for purposes of limited local notification to their school or any individuals whose safety is threatened by the juvenile. This is the first step.

¶ 85    The second step is when a juvenile violent offender attains the age of 17. The second step of the process is actual registration on the statewide registry, along with the attendant required community notification, and this is not required until the youth violent offender turns 17 years old. Under the Act, when juvenile offenders register upon attaining the age of 17, they must then register for placement on the statewide registry, but they are allowed the concession of shortening the required 10-year registration period by the difference of years between 17 and their age and the time of the adjudication of their offense. Section 5(a) provides: "Registration of juveniles upon attaining 17 years of age shall not extend the original registration of 10 years from the date of conviction." 730 ILCS 154/5(a) (West 2012). The mandatory registration period is 10 years from the date of conviction or adjudication of the offense. 730 ILCS 154/40 (West 2012). The "date of conviction" for juveniles is the date of their adjudication. See 730 ILCS 154/5(a) (West 2012) ("For purposes of this Section, 'convicted' shall have the same meaning as 'adjudicated'."); 730 ILCS 154/40 (West 2012) ("Any other person who is required to register under this Act shall be required to register for a period of 10 years after conviction or adjudication ***.").

¶ 86    Although the Act generally requires all violent offenders against youth to "register," sections 5(a) and 10(a) contain a specific exception governing juveniles under the age of 17. Where a statute contains both a general and a specific provision relating to the same subject, the more specific provision prevails. *Knolls Condominium Ass'n v. Harms*, 202 Ill. 2d 450, 459 (2002). See also *People v. Botruff*, 212 Ill. 2d 166, 175 (2004) ("A fundamental rule of statutory construction is that where there exists a general statutory provision and a specific

statutory provision, either in the same or in another act, both relating to the same subject, the specific provision controls and should be applied."). Subsection 5(a) of the Act provides specifically for juveniles under 17 as follows:

> "For the purposes of this Act, a person who is defined as a violent offender against youth as a result of being adjudicated a *juvenile delinquent* under paragraph (2) of this subsection (a) upon attaining 17 years of age *shall be considered as having committed the violent offense against youth on or after the 17th birthday of the violent offender against youth*. Registration of juveniles *upon attaining 17 years of age* shall not extend the original registration of 10 years from the date of conviction." (Emphases added.) 730 ILCS 154/5(a) (West 2012).

¶ 87    Subsection 5(a)(2) makes it even clearer that a juvenile offender is not even "considered as having committed the violent offense against youth" until "on or after the 17th birthday of the violent offender against youth." 730 ILCS 154/5(a) (West 2012).

¶ 88    Subsection 10(a) of the Act also provides:

> "A person who has been adjudicated a juvenile delinquent for an act which, if committed by an adult, would be a violent offense against youth shall register as an adult violent offender against youth *within 10 days after attaining 17 years of age*." (Emphasis added.) 730 ILCS 154/10(a) (West 2012).

See also *People v. Evans*, 405 Ill. App. 3d 1005, 1006, 1009 (2010) (noting that the principal juvenile murderer was only 15 years old and not yet subject to registration under the Act, but his accomplice was already 17 and therefore was subject to registration).

¶ 89    Under the Illinois Administrative Code implementing the Act, juvenile violent offenders under 17 must provide their information to the police department, which then inputs the juvenile's information into the LEADS system. See 20 Ill. Adm. Code 1280.30 (2010). The Illinois Administrative Code somewhat confusingly refers to this act of the juvenile providing his or her information to the police for entry into LEADS for local school notification as "registration:"

> "f) Registration of Juveniles
>
> The parent, legal guardian, probation or parole supervisor, or other court-appointed custodian shall accompany juveniles to the agency of jurisdiction for the purpose of registering as a violent offender against youth." 20 Ill. Adm. Code 1283.40(f) (2010).

¶ 90    But section 1283.50(j) goes on to clearly repeat the language of the Act that a juvenile under 17 does not actually register on the statewide registry until he or she attains 17 years of age and is actually required to "register" for placement on the statewide registry:

> "j) Juvenile Registration
>
> A person who has been adjudicated a juvenile delinquent for an act that, if committed by an adult, would be a violent offense against youth *shall register as an adult violent offender* against youth *within 10 days after attaining 17 years of age. Upon registering as an adult, the juvenile offender will be placed on the Illinois State Police Violent Offender Against Youth Registry website* after an authorization letter is signed by the offender and received by the Illinois State Police." (Emphases added.) 20 Ill. Adm. Code 1283.50(j) (2010).

¶ 91     Section 1283.40(c)(1) provides generally that:

"The agency of jurisdiction will complete the Child Murderer and Violent Offender Against Youth *Registration Form*; ensure the violent offender against youth reads and signs the form, provide one copy of the form to the violent offender against youth, keep the original signed copy until the requirement to register has expired, and, within 3 days, *enter registration information into LEADS*; and *forward a copy of the violent offender against youth's photograph to the Department*." (Emphases added.) 20 Ill. Adm. Code 1283.40(c)(1) (2010).

¶ 92     This "registration form" is merely the form filled out and given to local law enforcement. 20 Ill. Adm. Code 1283.40(c)(1) (2010). It does not accomplish actual registration on the statewide registry, which as noted above, is done by the Illinois State Police, which determines which violent offenders must be placed on the statewide registry and community-wide notification. 730 ILCS 154/85, 95 (West 2012).

¶ 93     Although this act of providing information as a juvenile to local law enforcement is also called "registering," it is clear that there is no registration on the actual statewide registry. Rather, this information is only input into the LEADS system and then used for local notification. There is only one statewide database for the Illinois Murderer and Violent Offender Against Youth Registry, which is a statewide online database established and maintained by the Illinois State Police. See 730 ILCS 154/85 (West 2012). There is no separate "juvenile registry," as M.A. contends.

¶ 94     "Notification regarding juvenile offenders" under 17 is governed by section 100, which is not a registration provision. 730 ILCS 154/100 (West 2012). Section 100 contrasts with section 95, governing adults, which mandates that adults required to register on the statewide registry are subject to mandatory community notification. 730 ILCS 154/95 (West 2012). Section 100 provides only for limited notification: (1) to the juvenile's school; and (2) pursuant to police discretion, to specific individuals whose safety is compromised by the juvenile violent offender. Local law enforcement, not the juvenile, is responsible for forwarding this information to the juvenile's school and any individuals whose safety may be compromised. Under section 100 of the Act, juvenile offender information is only used for limited notification to the juvenile's school and individuals whose safety is threatened. See 730 ILCS 154/100 (West 2012). The Act specifically limits the juvenile's information to "only to the principal or chief administrative officer of the school and any guidance counselor designated by him or her" and "to any person when that person's safety may be compromised for some reason related to the juvenile violent offender against youth." 730 ILCS 154/100 (West 2012). The Act provides that: "The registration form shall be kept separately from any and all school records maintained on behalf of the juvenile violent offender against youth." 730 ILCS 154/100 (West 2012).

¶ 95     Unfortunately, both the Act and the Illinois Administrative Code provisions are less than clear because they both refer to all phases of this process also as "registration." For purposes of clarity, I suggest that trial courts specify in their orders regarding adjudicated juvenile violent offenders under the age of 17 that the "registration form" is only for the purpose of local law enforcement entering their information into LEADS and for the limited local notification under section 100 of the Act, not for the statewide registry. Simply using the word "register" on an order regarding a juvenile is confusing and can lead to an inference of being subject to actual registration on the public Illinois Murderer and Violent Offender

- 20 -

Against Youth Registry. It would be less confusing to use different terms to distinguish the two different processes and refer to the provisions for juveniles under 17 as required "notification" and to refer to the mandatory registration upon turning 17 as actual "registration."

¶ 96     In this case, M.A. signed a "Registration Form," which is in the record. The registration form is titled "Illinois Child Murderer and Violent Offender Against Youth Registration Form." There are checkboxes in the upper left-hand corner for "Juvenile Delinquent," "Child Murderer," and "Other Violent Offender." Apparently, the same "Registration Form" is used for both adults and juvenile offenders not yet required to register on the statewide registry, but a distinction is clearly made to identify juvenile violent offenders, as opposed to adult violent offenders. M.A.'s form was clearly checked "Juvenile Delinquent." It was entered by the court on August 6, 2013, the date of her adjudication. There is no evidence in the record that M.A.'s information was entered into LEADS as anything other than a *juvenile* violent offender.

¶ 97     I do not agree that the Act violates procedural due process. While cases such as *Roper* and *Graham* afford juveniles some additional protections in terms of punishment in the context of the eighth amendment, the same has not been held in terms of other constitutional guarantees. First, registration is a collateral consequence to the determination of adjudication of delinquency and is not considered a penalty or punishment. See *People v. Cardona*, 2013 IL 114076, ¶ 24 ("it is worth repeating that sex offender registration is not punishment"); *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 203 (2009) ("This court has repeatedly held, though, that the [Sex Offender Registration Act's] requirements do not constitute punishment. [Citations.]"). The Illinois Supreme Court and our courts have recognized that the similar sex offender registration requirement is a collateral consequence and is not punishment. See *In re Jonathon C.B.*, 2011 IL 107750, ¶ 185; *People v. Black*, 2012 IL App (1st) 101817, ¶ 19. The Act's registration requirement for violent offenders against youth is also a collateral consequence.

¶ 98     M.A. received all the process she was due for her adjudication of delinquency, which resulted in the mandatory triggering of the Act's requirements. Procedural due process in the context of juvenile delinquency requires that the adjudicatory hearing of a juvenile delinquency proceeding must comport with the essential requirements of procedural due process, which are: notice of the charges; right to counsel; right of confrontation; and the right of protection against self-incrimination. *In re Fucini*, 44 Ill. 2d 305, 308-09 (1970) (citing *In re Gault*, 387 U.S. 1, 13 (1967)). Due process is a flexible concept, and " ' "not all situations calling for procedural safeguards call for the same kind of procedure." ' " *People v. Cardona*, 2013 IL 114076, ¶ 15 (quoting *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 272 (2004), quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). M.A. received notice of the charges, her right to counsel, her right of confrontation, and her right of protection against self-incrimination. She received all her due process rights and had a fair and full adjudication hearing.

¶ 99     The Illinois Supreme Court has noted that the United States Supreme Court has held that the due process clause does not require the right to a jury trial in juvenile delinquency proceedings because a juvenile delinquency proceeding is fundamentally different from a criminal proceeding and cannot be equated to a criminal prosecution within the meaning of the sixth amendment. *Konetski*, 233 Ill. 2d 185 at 201-02 (citing *McKeiver v. Pennsylvania*,

403 U.S. 528, 541-51 (1971) (plurality op.)). A minor is entitled to a jury trial in only several limited instances. See *In re Jonathon C.B.*, 2011 IL 107750, ¶ 80.

¶ 100    I also do not agree that the Act violates equal protection. Under the rational basis test, our review is limited and deferential. *Hudson v. YMCA of Metropolitan Chicago, LLC*, 377 Ill. App. 3d 631, 638 (2007) (citing *People v. Cully*, 286 Ill. App. 3d 155, 163 (1997)). Even if a statute's construction is doubtful, we must resolve those doubts in favor of its validity. *Hudson*, 377 Ill. App. 3d at 638 (citing *Rockford Memorial Hospital v. Department of Human Rights*, 272 Ill. App. 3d 751, 763 (1995)).

¶ 101    The State argues that the Sex Offender Registration Act's early termination provision is different because the legislative intent was solely to shield youthful sexually inappropriate behavior because of immaturity rather than predatory inclinations, and I agree. M.A.'s comparison of the two acts, the Illinois Murderer and Violent Offender Against Youth Registration Act and the Sex Offender Registration Act, is not correct. Juvenile sex offenders still are required to register and remain on the sex offender registry for a minimum of five years before they can petition for early termination. See 730 ILCS 150/3-5(a), (c) (West 2012).

¶ 102    The legislature has not expressed any concern regarding any similar innocent indiscretion for juvenile offenders who have been proven to be *violent*, that is, without being sex offenders too. Clearly, there is a rational basis to treat the two categories of juvenile offenders differently.

¶ 103    I highlight the fact that the operation of the Act already provides a concession to juvenile offenders, giving an automatic reduction of the required time on the registry in proportion to how young the juvenile offender was at the time of his or her offense. The mandatory 10-year registration period begins running at the time of the adjudication, not at the time of registration. 730 ILCS 154/5(a) (West 2012). In M.A.'s case, she was 13 at the time of her adjudication, and so upon being required to register after turning 17 she will be required to remain on the statewide registry for six years.

¶ 104    The legislature had a rational basis to provide these different remedies to juvenile offenders whose crimes are different. There is no support for requiring the exact same remedy for juveniles who are not similarly situated.

¶ 105    I also do not agree with reweighing the evidence in M.A.'s case to find the Act unconstitutional. While I do have sympathy for M.A.'s background, the fact remains that the trial court heard all the testimony and observed her and was in the best position to determine her guilt or innocence and any mitigating factors. For us to reweigh the evidence before the trial judge and the trial judge's determination that M.A. in fact was guilty of stabbing her brother is improper. While the majority finds it understandable that M.A. stabbed her brother due to her toxic environment and abuse at the hands of her brother, there are many abused children who do *not* resort to violence. The legislature is well within its authority in determining that juveniles who commit violence against other children should register as adults when they turn 17, if they indeed committed the violent offense. Protecting other innocent children is a legitimate state interest, and requiring that juvenile violent offenders register as adults when they turn 17 to complete the 10-year mandated registration period is rationally related to that state interest.

¶ 106    Finally, I note that M.A. does not challenge the Act's provisions requiring providing information to local law enforcement and requiring local notification for juveniles under 17.

In fact, she argues in *favor* of allowing for such local notification, misapprehending that she is instead subject to registration on the actual *statewide registry* and *community* notification when that is not the case. M.A. specifically argues that the limitations on the dissemination of juvenile offenders' information for limited notification should be the same as under the Sex Offender Registration Act. They in fact are. The very relief M.A. seeks in limiting the dissemination of her information has already been provided in the Act. Thus, any argument by M.A. regarding the notification provisions is moot, because the Act already provides the very relief she is seeking–limited local notification.

¶ 107    The provisions of the Act for juveniles under 17 requiring providing information to law enforcement and local notification, as well as the provisions automatically requiring registration on the statewide registry and community notification upon attaining the age of 17, do not violate procedural due process or equal protection, as they do not implicate any fundamental right, and they are rationally related to the State's interest in protecting the safety of its citizens.

¶ 108    There is also nothing unconstitutional about the way the Act has been applied to M.A., and she already has the remedy she is seeking under the Act. Therefore, I would uphold the constitutionality of the Act and affirm.